UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2011 DEC -1 P 2: 04

JON A. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 11-CR-224

JEFFREY A. MEYERS,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, James L. Santelle, United States

Attorney for the Eastern District of Wisconsin, and Mel S. Johnson and Daniel H. Sanders,

Assistant United States Attorneys, and the defendant, Jeffrey A. Meyers, individually and by

Attorney Jeffrey Morgan, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter

into the following plea agreement:

### CHARGES

2.      The defendant has been charged in 3 counts of a 15-count indictment which

alleges violations of Title 18, United States Code, Sections 371, 2312, and 2314.

3.      The defendant has read and fully understands the charges contained in the

indictment. He fully understands the nature and elements of the crimes with which he has been

charged, and those charges and the terms and conditions of the plea agreement have been fully

explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE

### THE GRAND JURY CHARGES THAT:

*From on or about April 1, 2011 through on or about October 3, 2011, in the state and Eastern District of Wisconsin, and elsewhere,*

### JOSE G. ROSALES,
### MARIO ROSALES,
### LEONILO TIRSE,
### OLIVER CASTILLO,
### FELIX M. COTTO-ALOMAR, and
### JEFFREY A. MEYERS

*knowingly conspired with each other and others to commit the following offenses against the United States:*

*1. To transport in interstate commerce goods and merchandise worth $5,000 or more, knowing them to have been stolen, all in violation of Title 18, United States Code, Section 2314;*

*2. To transport motor vehicles in interstate commerce, knowing them to have been stolen, all in violation of Title 18, United States Code, Section 2312.*

### Acts in Furtherance

*In furtherance of the conspiracy and to effect its objects, the defendants performed the following acts:*

2

1.      On or about April 17, 2011, defendants Castillo, Tirse, Mario Rosales, and Jose Rosales stole a Freightliner truck tractor in West Milwaukee, Wisconsin.

2.      On or about April 18, 2011, defendants Cotto-Alomar, Castillo, Tirse, Mario Rosales, and Jose Rosales stole a Wabash truck trailer worth approximately $15,000 in Milwaukee, Wisconsin, loaded with Sponge Bob Square Pants fruit snacks worth more than $35,000.

3.      On or about April 18, 2011, defendants Cotto-Alomar, Castillo, Meyers, and Jose Rosales transported the stolen Freightliner tractor and Wabash trailer and the stolen fruit snacks from Milwaukee to Waukegan, Illinois.

4.      On or about April 23, 2011, defendant Jose Rosales caused the theft of Freightliner tractor and a Great Dane trailer worth approximately $18,000 which contained pallets of Miller beer products worth more than $20,000. The theft was in West Allis, Wisconsin.

5.      On or about May 29, 2011, defendants Jose Rosales, Mario Rosales, Tirse, Cotto-Alomar, and Castillo stole a Volvo tractor and a Heartland trailer worth approximately $15,000 on which was a shipping container filled with Nike shoes worth more than $200,000. The theft was in Milwaukee.

6.      On or about May 30, 2011, defendants Jose Rosales, Mario Rosales, Tirse, Cotto-Alomar, and Castillo transported the stolen Volvo tractor, Heartland trailer, and Nike shoes from Milwaukee to the area of Detroit, Michigan.

3

7.      On or about June 4, 2011, defendant Jose Rosales caused the theft of a
Freightliner tractor and a Great Dane trailer worth approximately $6,000 containing
cheese worth more than $60,000. The theft was in West Allis.

8.      On or about June 5, 2011, defendant Jose Rosales caused the stolen
Freightliner tractor, Great Dane trailer, and the cheese to be transported from West Allis
to the area of Detroit.

9.      On or about June 25, 2011, defendants Jose Rosales, Castillo, Cotto-
Alomar, and Meyers used the Freightliner tractor stolen in overt act 1 to steal a trailer
worth approximately $15,000 filled with Chex Mix worth more than $40,000. The theft
was in Milwaukee.

10.     On or about June 25, 2011, defendants Jose Rosales, Castillo, Cotto-
Alomar, and Meyers took the stolen Freightliner tractor and trailer filled with Chex Mix
to a storage area in Eagle, Wisconsin.

11.     On or about June 26, 2011, defendants Jose Rosales and Cotto-Alomar
moved the Freightliner tractor and trailer filled with Chex Mix into Milwaukee County,
leaving the trailer in Wauwatosa, Wisconsin, and the tractor at a different location in
Milwaukee.

12.     On or about June 27, 2011, defendant Jose Rosales told another individual
in Milwaukee that he wanted to find a warehouse with a loading dock for a truckload of
mixed chips.

4

13.  On or about July 2, 2011, defendants Meyers and Cotto-Alomar transported the Freightliner tractor and the trailer filled with Chex Mix from Wauwatosa to Bridgman, Michigan where they were stopped by police and arrested.

14.  On or about July 5, 2011, defendant Jose Rosales asked another person for help in raising bail for one of his "guys" who had been arrested over the preceding weekend.

15.  On or about August 10, 2011, defendant Jose Rosales went with another person to look at warehouse space in Milwaukee.

16.  On or about August 21, 2011, defendants Jose Rosales and Tirse caused the theft of a Freightliner tractor from West Allis.

17.  On or about August 21, 2011, defendant Mario Rosales opened up a number of trailers at a truck lot in Wauwatosa looking for a load of merchandise to steal.

18.  On or about August 21, 2011, defendants Mario Rosales, Jose Rosales, Tirse, and Castillo used the stolen tractor mentioned in overt act 16 to steal a trailer worth approximately $15,000 which contained antifreeze and windshield washer fluid worth more than $80,000 from a truck lot in Wauwatosa.

19.  On or about August 21, 2011, defendants Tirse, Castillo, Jose Rosales, and Mario Rosales transported the stolen Freightliner tractor and trailer containing antifreeze and windshield wiper fluid form Wauwatosa to the area of Detroit.

5

20.     On or about August 23, 2011, defendant Jose Rosales asked another person in Milwaukee to help him look for warehouse space in Milwaukee after he had stolen two trailers, one with antifreeze and one with refrigerators.

21.     On or about August 29, 2011, defendants Castillo, Tirse, Mario Rosales, and Jose Rosales were stopped by police in a truck lot in Perrysburg, Ohio preparing to steal a trailer loaded with diapers which they intended to transport to the Detroit area.

22.     On or about September 5, 2011, defendants Jose Rosales, Castillo, Mario Rosales, and Tirse opened various trailers and attempted to steal a Volvo tractor and a red shipping container filled with Harley Davidson clothing from a Milwaukee truck lot but were unable to when they were unable to cut the lock on the gate to the lot.

23.     On or about September 6, 2011, defendants Jose Rosales, Cotto-Alomar, Mario Rosales, Castillo, and Tirse stole a Mack tractor and a Transcraft trailer worth approximately $20,000 carrying six pallets of ice melter worth approximately $2,400 and a forklift worth approximately $30,000. The theft was from New Berlin, Wisconsin.

24.     On or about September 6 and 7, 2011, defendants Tirse, Castillo, Jose Rosales, Cotto-Alomar, and Mario Rosales transported the Mack tractor and the Transcraft trailer carrying the ice melter and the forklift from New Berlin to Gary, Indiana.

25.     On or about September 9, 2011, defendants Jose Rosales, Cotto-Alomar, Mario Rosales, Tirse, and Castillo stole a Peterbilt tractor and a Stoughton trailer worth

6

*approximately $25,000 containing cases of Pepsi Company beverages worth more than*
*$12,000. The theft was from Franksville, Wisconsin.*

    *26.    On or about September 10, 2011, defendants Jose Rosales, Mario Rosales,*
*Cotto-Alomar, Tirse, and Castillo transported the Peterbilt tractor and the Stoughton*
*trailer containing Pepsi products from Franksville to Harvey, Illinois.*

    *27.    On or about September 18, 2011, defendant Castillo helped to steal a*
*Kenworth tractor in Milwaukee.*

    *28.    On or about September 16, 2011, defendants Jose Rosales, Cotto-Alomar,*
*Mario Rosales, Tirse, and Castillo stole an International tractor and a Utility trailer*
*worth approximately $20,000 containing cases of chocolate products worth more than*
*$80,000. The theft was from Milwaukee.*

    *29.    On or about September 17, 2011, defendants Jose Rosales, Mario Rosales,*
*Cotto-Alomar, Tirse, and Castillo transported the International tractor and the Utility*
*trailer containing the chocolate products from Milwaukee to the Detroit area.*

    *30.    On or about September 27 and 28, 2011, defendant Jose Rosales had talks*
*with another person about using a warehouse in New Berlin.*

    *All in violation of Title 18, United States Code, Sections 371 and 2.*

    5.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of
the offenses described in paragraph 4. The parties acknowledge and understand that if this case
were to proceed to trial, the government would be able to prove the following facts beyond a

7

reasonable doubt. The defendant admits that these facts are true and correct and establish his

guilt beyond a reasonable doubt:

This indictment is based upon a series of thefts throughout 2011 of entire trucks with their cargo. Consistent with trucking terminology, the motor vehicle used to propel the truck is referred to as a tractor while the rolling container pulled by the tractor which contains the cargo is referred to as a trailer. The indictment alleges that the trucks which were stolen were then driven out of state to Michigan, Illinois, and Indiana to fences known to this group who would purchase the trucks' cargo. The tractors and trailers were then generally abandoned, and sometimes recovered, out of state.

The investigation involved two informants. Both of them have known Jose and dealt with him for years. They are aware that he often has miscellaneous merchandise he attempts to sell to people ranging anywhere from wine to elliptical machines to cigars to generators. They both state that they have had many conversations with him over the years when he has talked about stealing truckloads of merchandise. He has regularly referred to an Italian guy who lives in the Detroit area to whom he sells loads of merchandise.

During the conspiracy period in 2011, each informant has had a series of conversations with Jose, recorded in cooperation with law enforcement authorities. During those conversations, Jose has often asked the informants to help him find warehouse space to store merchandise and he has sometimes gone with them to look at possible space. These informants have also stated that they have met other defendants at meetings with Jose about all this, including Mario Rosales and Leonilo Tirse.

Surveillance of these defendants has also put them together on various occasions in the summer and fall of 2011.

A GPS tracker on Jose's Honda Odyssey van was one of two electronic techniques used to track his movements. The other was a court order obtained to ping the cell site locations for Jose's cell phone in order to track where it was.

An analysis of the particular thefts involved reveals a pattern which tended to link the various jobs charged in this indictment. These tractors and trailers were stolen from truck lots where transport companies customarily leave them, often filled with cargo. Some of these lots had security fences around them and, where that was the case, the fences were cut through in order to gain entry. The thieves often entered a number of trailers, only eventually taking one, as if looking for the best merchandise to steal. A window to the stolen tractor was usually broken in order to get in. An extra key for the tractor was often kept inside but, if not, the tractor was hot-wired in order to start it and move it. If not already connected, the stolen tractor would be connected to the trailer they meant to steal and they were driven off the lot together. If the truck

8

lot was gated, the thieves would cut the lock or chain in order to open the gate and drive off with the truck and the merchandise.

Oliver Castillo was arrested on October 6, 2011. He was *Mirandized* and immediately agreed to cooperate and describe the whole operation. He did so in considerable detail, describing a series of thefts and implicating all of the co-defendants as well as himself. The details of his descriptions of the various jobs will be described below. In general, like the informants, Castillo characterizes Jose as a professional thief who has for years stolen truckloads of merchandise as well as committing other thefts. Castillo describes conversations with Jose, Mario, Tirse, and other Cubans who have described years of cargo thefts involving merchandise ranging from plasma TVs to olive oil to leather dress shoes to New Balance tennis shoes. Jose has also spoken of selling merchandise to John Sciarrotta in Detroit.

West Milwaukee police reports establish the theft of a 2004 Freightliner tractor from a truck lot at 46th and Burnham in West Milwaukee on April 17, 2011. Castillo verified that he and Jose participated in the theft of that Freightliner. He described how that tractor was used to pull a stolen trailer full of SpongeBob SquarePants fruit snacks down to Waukegan, Illinois on or about April 18, 2011. Castillo stated that the fruit snacks could not be sold and they, along with the trailer and tractor, were just left in Waukegan.

With regard to the stolen Freightliner tractor taken from West Milwaukee on April 17, 2011, Castillo describes how that tractor, which had earlier been used to take stolen items down to Waukegan, was also used to steal a trailer loaded with Chex Mix from a truck lot at 814 West Armour Avenue in Milwaukee on June 25, 2011. According to Castillo, Jose, Felix Cotto-Alomar, and Castillo were in Jose's van looking for cargo to take and found this trailer. They went with Jeffrey Meyers and found the stolen tractor where they had left it in Waukegan. Meyers, who is sometimes employed as a truck driver, drove the tractor to the lot on Armour and hooked the tractor to the trailer. Then, per Jose's instructions, Meyers took it to a storage place in Eagle, Wisconsin. Jose, Cotto-Alomar, and Castillo followed in Jose's van.

Castillo said that the plan was to store the Chex Mix at the storage place in Eagle but those plans were changed after a police officer inquired about the trailer. Jose and Cotto-Alomar left the trailer overnight in Eagle, then moved it to a warehouse near Hwy. 100 and Burleigh in Wauwatosa. After dropping the trailer there, the tractor was left at a different lot near Hwy. 100 and Silver Spring where there were other trucks so it would not stand out.

Castillo states that Jose was having trouble selling the load so called John in Detroit. John apparently agreed to buy it so Castillo picked up Meyers and Cotto-Alomar and took them to the tractor. Meyers and Cotto-Alomar then brought the tractor to the trailer and drove off with it to Detroit.

9

Castillo states that he and Jose were following in Castillo's car. Cotto-Alomar called Jose on his cell phone to state that Michigan police had stopped Meyers and Cotto-Alomar in the truck.

That is true as Michigan state police records reflect that on July 2, 2011, they did stop this as a stolen truck. Both Meyers and Cotto-Alomar pled guilty to receiving stolen property. Meyers was placed on probation and Cotto-Alomar did 90 days.

Castillo's description of these events is consistent with other evidence compiled here. Milwaukee Police Detective Dave Baker learned that this trailer had been taken out to the Eagleville warehouse in Eagle. He found it out there, just parked on the premises. Baker opened the back of the trailer and saw that it contained Chex Mix and fruit snacks. He had seen a Honda van leaving the scene so drove back to Milwaukee to try to catch up to it. He did and saw it being driven by Jose on Keefe near Castillo's house. Later that day, on June 25, Dave went back out to the Eagleville warehouse. Through surveillance he could see that four men were present. Officer Don Jensen of the Eagle Police Department approached the men and identified them as Jose, Cotto-Alomar, Gregg Roy who owned the storage area, and a young man named Cody Duddles. It appeared that they had somehow gotten the truck stuck. Officer Jensen asked them what was in the trailer and no one seemed able to tell him.

In the meantime, Dave had placed GPS trackers on the tractor and trailer to monitor where they were taken. Also, Jose's son, Lazaro, called one of the informants to ask if he had a place to drop a truck off. Per Baker's instructions, the informant told Jose that this truck could be left outside a warehouse at 108th and Burleigh.

Based on the tracking devices, late that night, the tractor and trailer were moved from Eagle to the warehouse at 108th and Burleigh where the trailer was left. The tractor was then parked at 110th and Silver Spring.

On June 27, Jose met with one of the informants and told him he needed a loading dock to unload a truck load of mixed chips. The next day, Jose talked with the other informant and said that the trailer contained a load of Chex Mix and candy he planned to sell to local stores.

According to a man named Ray Hatch, who lives out in Waukesha County, Jose had also contacted him about buying this load because Hatch is in the business of buying and selling food which is near its expiration date. Hatch states that he refused to buy the Chex Mix because Jose could not produce an invoice.

Apparently, Jose's attempts to sell this cargo in Milwaukee were unsuccessful because, at mid-day on July 2, the tractor was moved to pick up the trailer and together they traveled on to the expressway through Illinois to Michigan. The truck was stopped by the Michigan police at 4:12 p.m. at Dave Baker's request.

10

The driver was Jeffrey Meyers and Felix Cotto-Alomar was a passenger. In the cab were found written directions, two pairs of gloves, and a bolt cutter.

Meyers said that he knew Cotto-Alomar because he sometimes buys cocaine from Cotto-Alomar's friend. He has experience in driving trucks and agreed to drive this truck for $200. He said that Cotto-Alomar would direct him where to go in Detroit.

For his part, Cotto-Alomar said that he was directed by Castillo and Jose to get the truck to Detroit for $800. He said that Castillo and Jose were following the truck and would meet with them in Detroit to direct them on where to take the truck with the cargo. He knew that the cargo was Chex Mix.

In a couple of ensuing conversations with one of the informants, Jose stated that one of his "guys" had been arrested over the weekend and Jose needed bail money. He asked the informant for help in raising that bail.

The owners estimated the value of the tractor to be $30,000, the trailer to be $15,000, and the Chex Mix to be $50,000.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

6.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: 5 years and $250,000. The count also carries a mandatory special assessment of $100 and a maximum of 3 years of supervised release. The parties further recognize that a restitution order may be entered by the court.

7.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

11

## DISMISSAL OF REMAINING COUNTS

8.     The government agrees to move to dismiss the remaining counts of the indictment

against the defendant at the time of sentencing.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of conspiracy

as set forth in count one, the government must prove each of the following propositions beyond a

reasonable doubt:

> First, that the conspiracy as alleged existed;
> Second, that the defendant knowingly became a member of the conspiracy with an
> intention to further it, and
> Third, that at least one act in furtherance of the conspiracy was committed by at least one
> of the conspirators.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the

presentence report, including that the presentence report be disclosed not less than 35 days before

the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to

be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the

court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to

the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing

guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4.

The defendant acknowledges and agrees that his attorney in turn has discussed the applicable

sentencing guidelines provisions with him to the defendant's satisfaction.

12

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

13

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 6 under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

17.     The government will recommend to the sentencing court that an 8-level increase for loss of more than $70,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(E) is applicable to the offense level for the offense charged in count one.

18.     The parties agree to recommend to the sentencing court that a 2-level increase for a scheme to steal vehicles under guideline Section 2B1.1(b)(12)(A) is applicable to the offense level for count one.

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

14

## Sentencing Recommendations

20.    Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.    Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.    The government agrees to recommend a sentence of incarceration at the low end of the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23.    The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.    The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

15

## FINANCIAL MATTERS

25.     The defendant acknowledges and understands that any and all financial

obligations imposed by the sentencing court are due and payable in full upon entry of the

judgment of conviction. The defendant agrees not to request any delay or stay in payment of any

and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate

in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the

Court specifically directs participation or imposes a schedule of payments.

26.     As long as court-ordered financial obligations remain unpaid, the defendant agrees

to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon

request of the FLU during any period of probation or supervised release imposed by the court, a

complete and sworn financial statement on a form provided by FLU and any documentation

required by the form. The defendant further agrees, upon request of FLU whether made before or

after sentencing, to promptly: cooperate in the identification of assets in which the defendant has

an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $100 prior to

or at the time of sentencing.

### Restitution

28.     The defendant agrees to pay restitution as determined by the Court in connection

with the thefts described in Acts 9-13 of the "Acts in Furtherance" section of count one. The

defendant understands that because restitution for the offense is mandatory, the amount of

restitution shall be imposed by the court regardless of the defendant's financial resources. The

16

defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

29. The defendant further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

30. Any promise to make a favorable recommendation based upon defendant's substantial assistance is contingent upon the complete truthfulness of the defendant. If it is determined at any time that he has provided information to the government investigators or testimony in any legal proceeding which he knew to be false, any agreement which had been made could be nullified by the United States. In that event, the United States would reserve the right to use any statements he has made as evidence against him.

17

## DEFENDANT'S WAIVER OF RIGHTS

31.     In entering this agreement, the defendant acknowledges and understands that in so

doing he surrenders any claims he may have raised in any pretrial motion as well as certain rights

which include the following:

a.      If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.      If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.      At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.      At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

18

32.     The defendant acknowledges and understands that by pleading guilty he is
waiving all the rights set forth above. The defendant further acknowledges the fact that his
attorney has explained these rights to him and the consequences of his waiver of these rights.
The defendant further acknowledges that as a part of the guilty plea hearing, the court may
question the defendant under oath, on the record, and in the presence of counsel about the offense
to which the defendant intends to plead guilty. The defendant further understands that the
defendant's answers may later be used against the defendant in a prosecution for perjury or false
statement.

33.     The defendant acknowledges and understands that he will be adjudicated guilty of
the offense to which he will plead guilty and thereby may be deprived of certain rights, including
but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms,
and to be employed by a federally insured financial institution.

### Further Civil or Administrative Action

34.     The defendant acknowledges, understands, and agrees that the defendant has
discussed with his attorney and understands that nothing contained in this agreement, including
any attachment, is meant to limit the rights and authority of the United States of America or any
other state or local government to take further civil, administrative, or regulatory action against
the defendant, including but not limited to any listing and debarment proceedings to restrict
rights and opportunities of the defendant to contract with or receive assistance, loans, and
benefits from United States government agencies.

19

## GENERAL MATTERS

35.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

39.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement may become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all

20

charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

40. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

21

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/1/11

JEFFREY A. MEYERS
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/1/11

JEFFREY J. MORGAN
Attorney for Defendant

For the United States of America:

Date: 12/1/11

JAMES L. SANTELLE
United States Attorney

Date: Dec. 1, 2011

MEL S. JOHNSON
DANIEL H. SANDERS
Assistant United States Attorneys

22